**WADE KILPELA SLADE LLP**
Gillian L. Wade, State Bar No. 229124
gwade@waykayslay.com
Marc A. Castaneda, State Bar No. 299001
marc@waykayslay.com
2450 Colorado Ave., Ste. 100E
Santa Monica, California 90404
Telephone: (310) 396-9600

**CARNEY BATES & PULLIAM, PLLC**
Allen Carney (to apply for *pro hac vice*)
acarney@cbplaw.com
Joseph Henry (Hank) Bates, III (SBN 167688)
hbates@cbplaw.com
Samuel Randolph Jackson (to apply for *pro hac vice*)
sjackson@cbplaw.com
One Allied Drive, Suite 1400
Little Rock, AR 72202
Telephone: (501) 312-8500
Facsimile: (501) 312-8505

*Attorneys for Plaintiffs and the Class*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| KELLY ALLEN and CHRISTOPHER THOMPSON, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>TRINITY BROADCASTING OF TEXAS, INC. d/b/a TRINITY BROADCASTING NETWORK,<br><br>Defendant. | CASE NO.:<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

1

Plaintiffs Kelly Allen and Christopher Thompson, individually and on behalf of all other similarly situated persons ("Plaintiffs"), bring this action against Trinity Broadcasting Network ("Defendant") for its violations of the federal Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA" or "the Act"). Plaintiffs' claims arise from Defendant's practice of knowingly disclosing to a third party, Meta Platforms, Inc. ("Meta"), "personally identifiable information" which identifies the prerecorded audio visual material Plaintiffs and similarly situated subscribers request or obtain from Defendant's website, https://www.tbnplus.com/ et. al.[1], (the "Website"). Plaintiffs' allegations are made on personal knowledge as to Plaintiffs and their own acts and upon information and belief as to all other matters.

## NATURE OF THE CASE

1.     Plaintiffs bring this class action against TBN to protect the privacy rights granted to them under federal law, rights Defendant violated by knowingly disclosing its subscribers' personally identifiable information to Meta. Specifically, Defendant knowingly disclosed to Meta information which identified the audio visual materials its subscribers requested or obtained from its website.

2.     The VPPA prohibits "video tape service providers," such as Defendant, from "knowingly disclos[ing]" consumers' personally identifiable information ("PII"), defined as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

3.     Defendant operates an online video-streaming platform which publishes a wide variety of Christian audio visual material and invites users to establish a "subscription" to its video platform—a subscription which grants access to TBN's library of videos in exchange for providing their personal information, including their names and email addresses.

---

[1] Plaintiffs' claims include not only the root website https://www.tbnplus.com/, but also any page included within the Website (e.g., https://www.tbnplus.com/p/xIk7G9nu).

4.      When subscribers request or obtain audio visual materials on the platform, Defendant discloses their video-watching activity to Meta by specifically identifying the audio visual materials subscribers request and/or obtain.

5.      Defendant discloses subscribers' activity through Meta's advertising technologies which are designed to improve Defendant's advertising campaigns on Meta's platforms. These technologies are the Meta Pixel (enhanced by Meta's Automatic Advanced Matching technology) and the Conversions API.

6.      Defendant purposely installed the Meta Pixel on its website domain to disclose its subscribers' video-watching behavior to Meta.

7.      TBN communicates its subscribers' video-watching behavior to Meta through transmissions which include two distinct data points, inextricably linked within a single transmission of information to Meta. First, the transmissions to Meta include identifying information for the subscriber, which is either the subscribers' Facebook IDs ("FID"), a number Meta assigns to each unique Facebook profile and which, by itself, makes the profile identifiable (shared by the Pixel), and/or the subscribers' names and email addresses (shared by Advanced Matching and the Conversions API). The second data point is the URL of the webpage publishing the video requested or obtained by the TBN+ subscriber—a URL which includes the title of the video (and TBN designed its URLs to include such titles). These data points are transmitted to Meta together and therefore constitute "personally identifiable information" ("PII") because they identify the audio visual materials TBN+ subscribers request or obtain from TBN+.

8.      Upon receipt of TBN's disclosure of a subscriber's FID, Meta can easily locate and identify the particular subscriber's corresponding Facebook profile because the FID is by itself capable of identifying the subscriber's profile.

9.      TBN also uses Meta's "Automatic Advanced Matching" technology ("Advanced Matching"), which shares every subscriber's name and email address with Meta *in addition to* such subscribers' FID and URL. The email address is

shared even if the subscriber is (i) not a Facebook user or (ii) is not logged into his or her Facebook account. Communicating a subscriber's name and email address to Meta undoubtedly makes the subscriber identifiable, and because this is transmitted alongside the titles of videos such subscriber's requested or obtained, the transmissions constitute PII.

10.    Upon information and belief, Defendant also operates Meta's Conversions API ("CAPI"), a server-side technology which shares PII with Meta directly from Defendant's server, as opposed to sharing it via the subscribers' browsers and/or devices. CAPI shares the information TBN possesses about its subscribers (names and email addresses) alongside the URLs of the videos such subscribers request or obtain.

11.    CAPI shares PII with Meta regardless of whether subscribers (i) possess and are logged in to their Facebook profiles or (ii) utilize a cookie-blocking or browser-security program. In fact, CAPI shares PII for *every TBN+ subscriber* who requested or obtained video material from TBN+ through any medium on which TBN+ operates (including web browsers, mobile applications, and other device applications).

12.    Until recently, TBN did not even attempt to notify its subscribers it was sharing their video-watching behavior with third parties, but TBN now *admits* that it shares PII with third parties[2] (but not in a form sufficient to constitute consent for such disclosures under the VPPA).

13.    During the relevant time period, any person could link Plaintiffs' unique FID to their Facebook pages where the following information specifically identifying them was publicly available: their full names (first, middle and last), photograph, and cities and states of residence.

---

[2] Cookie Banner, www.tbn.org (last accessed March 19, 2025)

14.    Federal law, through the VPPA, prohibits video tape service providers, such as Defendant, from disclosing this information to third parties, establishing that consumers have a right of privacy in their video-watching behavior.

15.    On behalf of themselves and all similarly situated subscribers of Defendant, Plaintiffs seek an order enjoining Defendant from further unauthorized disclosures of subscribers' PII; awarding liquidated damages in the amount of $2,500 per violation, attorneys' fees, and costs; and granting any other preliminary or equitable relief the Court deems appropriate.

## PARTIES

16.    Plaintiff Kelly Allen is an individual who lives and is domiciled in Loudon, Tennessee and subscribes to Defendant's Website. She requests or obtains prerecorded audio visual material on the Website using her web browser.

17.    Plaintiff Christopher Thompson is an individual who lives and is domiciled in Denver, Colorado and subscribes to Defendant's Website. He requests or obtains prerecorded audio visual material on the Website using his web browser.

18.    Defendant, The Trinity Broadcasting Network of Texas, Inc., is a Texas Corporation headquartered at 13600 Heritage Parkway Suite 200 Fort Worth, TX 76177, and operates TBNplus.com through which it surveils its subscribers' viewing behavior and knowingly discloses their PII to third parties including Meta. Specifically, TBN, through its website shares its subscribers' PII via the Meta Pixel (enhanced with Advanced Matching) and CAPI.

19.    Defendant's online domain "is home to the largest library of Christian media showcasing powerful teachings, sermons, conferences, worship experiences, faith-based movies, current events from a Biblical worldview, and uplifting exclusive original series."[3] These audio visual materials are available on the TBN+

---

[3] TBN+ Account Home Page, *Stream Anytime. Anywhere*., Trinity Broadcasting of Texas, Inc., https://www.tbnplus.com/ (last visited October 16, 2024).

platform to "stream anytime, anywhere."[4] Defendant's platform is substantially involved in the delivery of audio visual materials to its subscribers, and its platform is significantly tailored to do so. Defendant is "engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," and accordingly falls within the VPPA's definition of "video tape service provider." 18 U.S.C. § 2710(a)(4). In fact, TBN's sole purpose in operating TBN+ is to deliver audio visual content to subscribers through their web browsers, mobile applications, or other mediums for receiving video content.

20.    When a logged-in subscriber requests or obtains a video, the primary information on the page is the video itself – any other information on the page is published in support of such video, such as a summary of the video contents, identification of the individuals involved in the video, or other information about the videos. Information on the page which is not relevant to the video on such a page encourages the subscriber to view other videos in the TBN+ library.

## JURISDICTION AND VENUE

21.    This Court has personal jurisdiction over Defendant because Defendant has purposefully availed itself of the privileges of conducting business within this District, the claims relate to Defendant's forum-related activities, and the Website's Terms of Use state courts in Orange County, California have exclusive jurisdiction for all disputes arising out of or relating to use of the Website.[5]

22.    This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

23.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391, and pursuant to the Website's Terms of Use which state Orange County, California, has exclusive venue over all disputes arising out of or relating to use of the Website.[6]

___

[4] *Id.*

[5] TBN, *Terms of Use*, https://www.tbn.org/terms (last visited October 16, 2024).

[6] *Id.*

## COMMON FACTUAL ALLEGATIONS

### I. Background of the VPPA

24.    The VPPA is a robust privacy statute, providing broad protection for video watching behavior. It prohibits "a video tape service provider," from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider[.]" 18 U.S.C. § 2710(b)(1).

25.    The VPPA was enacted in response to a profile of then-Supreme Court nominee Judge Robert H. Bork that was published by a Washington, D.C. newspaper during his confirmation hearings. The profile contained a list of 146 films that Judge Bork and his family rented from a video store. Members of Congress denounced the disclosure as repugnant to the right of privacy.

26.    Then Senator Leahy, one of the senators who introduced the VPPA Legislation, commented on the profile during the nomination hearing: "It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home." S. Rep. No. 100-599, at 5-6. "Privacy is not a conservative or liberal or moderate issue. It is an issue that goes to the deepest yearnings of all Americans that we are free and we cherish our freedom and we want our freedom. We want to be left alone." *Id*.

27.    The VPPA was introduced by a bipartisan group of Senators "[t]o preserve personal privacy with respect to the rental, purchase, or delivery of video tapes or similar audio visual materials," and it "reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." S. Rep. No. 100-599, at 1, 8.

28.    While the concerns about privacy were undoubtedly true in 1988 when the VPPA was passed, the importance of privacy legislation in the modern era of

data mining is more pronounced.[7] Indeed, during a 2012 Senate Judiciary Committee meeting entitled "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Patrick Leahy emphasized that, "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."

29.    Courts have no trouble holding that violations of the VPPA cause sufficiently concrete harms and bear a close relationship to traditional privacy harms actionable in English and American courts, including intrusion upon seclusion and disclosure of private facts.

30.    Plaintiffs allege Defendant shared their private information with an unauthorized third party when it transmitted their video-watching behavior to Meta. This act constitutes an invasion of privacy that is highly offensive to a reasonable person.

31.    Plaintiffs do not merely allege exposure of such sensitive information to Meta, but that their information was disclosed to Meta *subject to an arrangement* between Defendant and Meta pursuant to which Defendant deliberately uses the Meta Pixel.[8]

32.    Plaintiff's allegations fall squarely within the scope of interests protected by the VPPA, which "seeks redress for unauthorized disclosures of information that, in Congress's judgment, ought to remain private."[9]

---

[7] Congress "did not intend for the VPPA to gather dust next to our VHS tapes. Our modern means of consuming content may be different, but the VPPA's privacy protections remain as robust today as they were in 1988." *Salazar v. National Basketball Association*, 118 F.4th 353, 553 (2d. Cir. 2024)
[8] *See id*. at 542.
[9] *In re Nickelodeon Consumer Privacy Litigation*, 827 F.3d 262, 274 (3d. Cir. 2016); *see also Eichenberger v. ESPN, Inc.*, 876 F.3d 979 (9th. Cir. 2017) (holding violations of the VPPA cause concrete injury).

33.   The right of privacy in the prerecorded audio visual material one requests or obtains is inviolate.

## II.    TBN Violates The VPPA

### A. *Plaintiffs And Class Members Are "Consumers"*

34.   The VPPA prohibits a video tape service provider (like Defendant) from sharing the PII of its "consumers," which the VPPA defines as "any renter, purchaser, or subscriber of goods or services from a video tape service provider."

35.   Defendant invites users to register subscriptions with its video-streaming platform and in exchange provides access to exclusive, restricted audio visual content. Plaintiffs are "consumers" of TBN because they subscribe to TBN's goods or services (i.e., its video-streaming platform, available at tbnplus.com).[10]

36.   Only individuals who establish a subscription with tbnplus.com obtain access to TBN's audio visual materials. To establish such an account and request or obtain TBN+ audio visual material, a user must submit his or her personal and contact information, including full name and email address. Becoming a subscriber makes the individual identifiable to Defendant and provides a method by which Defendant can contact subscribers, which it does periodically by sending news and marketing materials advertising TBN+ video content.

37.   In addition to the information Plaintiffs provided to Defendant to register their subscriptions and access audio visual content, Defendant collected usage and identifying data from Plaintiffs when they interacted with the Website,

---

[10] Unlike many other VPPA cases analyzing whether subscribers of a website's newsletter qualify as "consumers" where such newsletters did not contain video content, Plaintiffs and the class members undoubtedly registered their subscriptions to access the TBN+ video-streaming platform: there is no question that a factual nexus exists between the subscription Plaintiffs registered and the video content to which their subscriptions granted them access.

including but not limited to, their IP addresses and information about their browsers.[11]

38. Defendant offers two subscription options: (1) a Free Account, which gives subscribers access to TBN content with advertisements, and (2) a Premium Account which gives subscribers access to additional TBN content and ad-free viewing.[12] Both the "free" and the "paid" subscriptions require a user to submit personal and contact information to obtain access TBN's audio visual materials.



*Figure 1*

39. When submitting personal information and establishing a "subscription," TBN+ purports to bind such subscribers (free or paid) to its Terms

---

[11] *See* TBN, *Privacy Rights*, https://www.tbn.org/privacy (last accessed March 14, 2025).
[12] *TBN+, Choose Your Streaming Experience*, https://www.tbnplus.com/select-plan (last visited March 14, 2025).

and Conditions and its Privacy Policy.[13] TBN itself refers to such accountholders as "subscribers," as demonstrated below.



*Figure 2*[14]

40.    Only by registering an account with TBN+ will Defendant's video-streaming platform begin delivering audio visual materials to Plaintiffs and the class members. So long as a subscriber maintains his or her subscription, TBN grants such subscriber access to its video-streaming platform after logging in by providing the registered credentials.

41.    After entering their credentials and gaining access to the logged-in portion of tbnplus.com, subscribers can request or obtain TBN+'s video materials by maneuvering around the TBN+ website or by searching for video materials. A subscriber that loads a page to obtain a video causes his web browser to submit a GET request[15] to the TBN+ server. In response to the GET request, the TBN+ server

---

[13] Only recently did TBN add a "cookie banner" to its website which purports to inform TBN+ users that it will share their video-watching information with third parties (and in fact admits TBN shares PII with third parties), although the language of the banner is insufficient to comprise consent as required by the VPPA.
[14] A user who clicks the "Subscribe Today" button will be directed to the page to establish a "free" or "paid" subscription depicted in Figure 1.
[15] There is nothing special or technical about a GET request. It is simply the language through which web browsers and website servers communicate with each

11

will deliver such video materials to the subscriber's web browser which allows the subscriber's browser to play the video.

42.    When subscribers request or obtain audio visual materials (which occurs on virtually every page of TBN+ because TBN+ *only* offers audio visual content), TBN delivers such video content through a system known as an HTTP-based system, which operates as follows: On the one hand is the subscriber's web browser (known as the "client" or "user-agent"), which is a tool that acts on the subscriber's behalf and facilitates access to information hosted on the internet. On the other hand is TBN's "web server" which is owned, operated, and/or controlled by TBN and hosts all of the video content available to TBN+ subscribers. The HTTP system works by communicating between these two tools ("client" and "web server"), and such communications are made in the form of "requests" and "responses."[16]

43.    When subscribers log into TBN+ and access video content, their client-web browsers send "requests" (known as a "GET request") to TBN's web server identifying the requested video within the URL. The subscriber's request informs TBN that it should "serve" the requested video materials. In "response," TBN's server delivers the requested information (here, audio visual material) to the subscriber's client-web browser. Upon delivery, the subscriber's web browser facilitates viewing of the video.

44.    The subscription obtained by Plaintiffs was a subscription to access audio visual goods or services produced and delivered by TBN+.

45.    Such subscription was, and is, a two-way street. In exchange for registering their accounts to view restricted audio visual materials, Plaintiffs agreed

---

other. Every user who, through his or her browser using HTTP protocol, accesses a website on the internet does so by submitting a GET request.

[16] mdn web docs, "An overview of HTTP," https://developer.mozilla.org/en-US/docs/Web/HTTP/Guides/Overview (last accessed March 19, 2025).

to make themselves—and their video-viewing behavior—identifiable to TBN, which TBN used by gathering data about its subscribers and which videos they requested or obtained. (Plaintiffs did not agree for TBN to share such information with third parties.)

46. By (i) providing their personal and contact information to Defendant to register their accounts, (ii) permitting TBN to store such personal information for granting them access to TBN+ in the future, (iii) receiving communications from Defendant via the provided contact information, (iv) agreeing to TBN+'s then-existing terms and conditions, (v) obtaining access to exclusive materials, and (vi) requesting Defendant to deliver restricted materials to their web browsers, Plaintiffs and class members are consumers of TBN+'s products and services.

*B. TBN Shared Its Consumers' PII With Meta*

  i. <u>Meta's Advertising Technologies Are Designed To Collect and Transmit Information About Subscribers' Online Behavior</u>

47. TBN deployed the Meta Pixel (enhanced with Advanced Matching) and likely the Conversions API across its platform, all of which are designed to surveil users' interactions with TBN+ and share such information with Meta—including subscribers' video-watching behavior. While subscribers watch videos on the TBN+ website, the Pixel surveils them and forces their browsers to send their video-watching behavior to Meta. Simultaneously, the Conversions API shares their video-watching information directly from TBN's server and does so for subscribers who use any of TBN+'s multiple video-viewing mediums, including but not limited to videos obtained from TBN's web browser and the TBN+ mobile application.

48. The Pixel is a unique string of code that operates to share subscribers' online activity with Meta[17], which Meta uses to create unique, detailed profiles

---

[17] Meta, *Meta Pixel*, Meta for Developers (2024) https://developers.facebook.com/docs/meta-pixel/ (last visited January 30, 2024); Meta, *Retargeting: Inspire People to Rediscover What They Love About Your*

filled with highly personal inferences about the subscribers, such as their "interests," "behavior," and "connections."[18] The Pixel shares subscribers' PII in the form of the URLs which include the titles of videos they request or obtain alongside their FIDs.

49.    CAPI is a server-side technology which shares subscribers' video selections alongside uniquely identifying information such as their names and email addresses directly with Meta, and which Meta also incorporates into the profiles it builds for advertising to individuals. CAPI shares the titles of videos subscribers' request or obtain in the form of the URLs. Like the Pixel, the transmissions include both the identifying information (names + email addresses) and the titles of the videos (URLs).

50.    Moreover, the advertising technologies recognize Defendant's subscribers even when they visit different websites or applications across the Internet—and even after a subscriber clears his or her browser history.

51.    Information about a website's users becomes the currency by which Meta and said website exchange value;[19] websites provide information to Meta, and in exchange, Meta provides unmatched advertising capabilities to Defendant. Meta promotes its pixel as a tool to "[f]ind new customers… Drive more sales… [and]

_____

*Business*, Meta for Developers (2024) https://www.facebook.com/business/goals/retargeting (Meta Pixel "tracks the people [who visit your website] and the type of actions they take.") (last visited January 30, 2024).

[18] Meta, Audience *Ad Targeting: How to find people most likely to respond to your ad,* Meta for Developers (2024), https://www.facebook.com/business/ads/ad-targeting (last visited January 30, 2024).

[19] *See* Ben-Shahar, Omri, *Privacy is the New Money, Thanks to Big Data*, Forbes, https://www.forbes.com/sites/omribenshahar/2016/04/01/privacy-is-the-new-money-thanks-to-big-data/?sh=2229e4853fa2 (last visited Feb. 6, 2024) ("We don't pay old money to use Facebook, Google search, CNET, or Forbes.com. Instead, each of these websites competes for our New Money currency—collecting mountains of information about us when we use their services and commercializing their databases.").

reach people who are more likely to take an action you care about, like making a purchase."[20] In fact, it is this very business model that earned Meta over *$160 billion* in advertising revenue in 2024.[21] Indeed, this is a strategy that TBN has embraced since 2019, pivoting away from telethons for donations and towards advertising, and in the process reporting millions of dollars of revenue.[22]

52.  Pivotal to the Meta Business Tools' effectiveness is their ability to link a user's interactions on websites across the internet with that specific user's Facebook profile. In fact, this is the fundamental purpose such technology serves, which continuously adds data from new interactions to the historical profiles Meta maintains on individuals with Facebook profiles. Each interaction sent to Meta (including by Defendant), is linked to all of the personal information Meta possesses about the user.

53.  After users' activity is transmitted to Meta, it compiles the information to pinpoint personalized "audiences" that consist of individuals who are likely to respond to a particular advertiser's messaging, improving the ability of businesses to serve specific subscribers with personalized advertisements (i.e., "targeted advertising"). This improves the accuracy and effectiveness of a business's advertising campaigns.

54. Among the personalized "audiences" Meta offers is a "custom audiences" option which is "an ad targeting option that lets you find your existing

---

[20] Meta Business Help Center, *About Meta Pixel*, Meta (2024) https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited October 16, 2024).

[21] Meta Investor Relations, *Meta Reports Fourth Quarter and Full Year 2024 Results*, Meta (January 29, 2025) https://investor.atmeta.com/investor-news/press-release-details/2025/Meta-Reports-Fourth-Quarter-and-Full-Year-2024-Results/default.aspx (last visited February 3, 2025).

[22] Bowen, Barry, *Trinity Broadcasting network Embraces Advertising Business Model*, Trinity Foundation (March 7, 2023) https://trinityfi.org/investigations/trinity-broadcasting-network-embraces-advertising-business-model/.

audiences among people *across Meta technologies*."[23] TBN used Custom Audiences to target advertising to subscribers and to attract new subscribers. Custom audiences include an "audience of your customers, website visitors, mobile app visitors, or people similar to them."[24]

55.   TBN's subscribers are sorted into custom audiences based on information gleaned from its implementation of the Business Tools including "email address, [FID]s, phone numbers, names, date of birth, gender, locations, app user IDs, Apple's Advertising Identifier (IDFA), Android's advertising ID or by a combination of rules used to identify users who took specific actions on your website."[25]

56.   Once placed in a custom audience, TBN targets its subscribers with advertisements directly pertaining to them based on actions previously taken on TBNs website and the fact that they have exhibited a pre-existing tendency to respond positively to such advertising materials.

57.   In addition to the information every user is required to provide to Meta when creating an account (including first and last name, date of birth, gender, email address and/or mobile number, and password), Meta also possesses and has access to all of the information every user has ever posted on her Facebook profile.

---

[23] About Custom Audiences, Meta Platforms, Inc. https://www.facebook.com/business/help/744354708981227?id=2469097953376494 (last visited March 18, 2025) (emphasis added).
[24] Custom Audience, Meta Platforms, Inc. https://developers.facebook.com/docs/marketing-api/reference/custom-audience/ (last visited March 18, 2025).
[25] *Id*.



*Figure 3*

58.    Thus, for each of Plaintiffs' interactions on the Website, Defendant's installation of Meta's advertising technology transmitted those interactions to Meta, which instantaneously associated that interaction with Plaintiffs' personal information that they submitted when creating their accounts, *and* any personal information *ever* available on their Facebook profiles.

59.    Approximately seven-in-ten U.S. citizens have a Facebook profile[26]— all of whom provided the same personal information to Meta when creating their Facebook accounts. Meta promotes its ability to allow businesses to target their ads

---

[26] Schaeffer, Katherine, *5 Facts about how Americans use Facebook, two decades after its launch*, Pew Research Center, (February 2, 2024) https://www.pewresearch.org/short-reads/2024/02/02/5-facts-about-how-americans-use-facebook-two-decades-after-its-launch/ (last accessed October 15, 2024).

to specific audiences using these types of identifying information[27] as well as information about actions specific users have taken on the businesses' websites.[28]

### III. How Defendant Discloses Subscribers' PII.

#### A. Via the Pixel

60.    When a subscriber requests or obtains prerecorded audio visual material on Defendant's Website, the Pixel installed and customized by Defendant discloses the subscriber's PII to Meta, such as information identifying the prerecorded audio visual materials the subscriber requests or obtains. Specifically, Defendant knowingly discloses to Meta a URL which includes the name of the prerecorded audio visual material requested or obtained and the subscriber's FID. Meta then "matches" the subscribers' interactions with TBN with the profile Meta created for the subscriber (which Meta can do because the transmission includes identifying information).

61.    An FID is a unique and persistent identifier that Meta assigns to each of its users. With nothing but a user's FID in hand, Meta can locate the user's unique Facebook profile.[29] In fact, any person with nothing more than a user's FID can locate the user's unique Facebook profile with the execution of one simple command within an internet browser. An FID is nothing short of a link to the user's Facebook profile.

---

[27] Meta Business Help Center, *Age and gender*, Meta, https://www.facebook.com/business/help/151999381652364 (last accessed October 15, 2024); *See also* Meta Business Help Center, *About specific targeting*, Meta, https://www.facebook.com/business/help/121933141221852?id=176276233019487 (last accessed October 15, 2024).

[28] Meta Business Help Center, *Options to create a website custom audience*, Meta, https://www.facebook.com/business/help/2539962959620307 (last visited October 15, 2024).

[29] The process by which Meta can locate the unique user's Facebook profile is simple enough that any ordinary person can perform this task by entering facebook.com/[FID] into the browser's search bar as detailed below.

62.    Upon receipt of the URL which contains an FID and the name of the video content a user requested or obtained—which Defendant knowingly discloses to Meta—Meta learns the identity of the subscriber and the specific prerecorded audio visual material she requests or obtains from the Website.

63.    Relevant here, through the Pixel it installed on its Website, Defendant knowingly disclosed to Meta both the title of the prerecorded audio visual material a subscriber requested or obtained and the subscriber's FID in one singular network transmission. Meta needs no additional information to connect a subscriber to the prerecorded audio visual material they requested or obtained on TBN+ This transmission is depicted in the below example:



*Figure 4*

64.    In this example, Defendant knowingly disclosed to Meta that Kendra Marta[30] requested or obtained Defendant's prerecorded audio visual material entitled "Does God Exist?"

65.    The FID is displayed as a numeric value referred to as the "c_user." The FID associated with Kendra Marta's Facebook profile is 100085022250478:

[30] For the purposes of demonstrating in this Complaint Defendant's practice of sharing consumers personally identifying information, an exemplary account for "Kendra Marta" was created and utilized.

19



*Figure 5*

66.    The disclosure of the FID is coupled with the title of the prerecorded audio visual material the subscriber requested or obtained within the URL transmitted to Meta:



*Figure 6*

67.    This transmission facilitates Meta's ability to specifically identify the subscriber requesting or obtaining the prerecorded audio visual material "Does God Exist?" because submitting "Facebook.com/100085022250478" into a browser's search bar (and nothing more), as illustrated by *Figure 7*, will direct the browser to populate Kendra Marta's Facebook profile page, as can be seen in *Figure 8*.



*Figure 7*



*Figure 8*

68.    The FID enables Meta to identify the specific subscriber requesting or obtaining prerecorded audio visual material. Indeed, this process is so simple that an ordinary person in possession of an FID could use this information to identify the subscriber, as it requires nothing more than entering https://www.facebook.com/[FID]/ into a browser's search bar.

69.    In addition to sharing PII via the Pixel, Meta encourages, and TBN implemented, the use of Advanced Matching as part of its Meta Business Tools configuration. Advanced Matching is Business Tools enhancement and improves the results obtained via Meta's surveillance advertising technologies.[31] TBN's use

---

[31] "Advanced matching can help you optimize your Meta ads to drive better results. With advanced matching, you can send us hashed customer information along with your Meta Pixel events, which can help you attribute more conversions and reach more people." *About Advanced Matching for Web*, Meta Platforms, Inc. https://www.facebook.com/business/help/611774685654668?id=1205376682832142 (last visited March 18, 2025).

of Advanced Matching facilitated the Business Tools to share the following information with Meta[32]:



**Automatic Advanced Matching**

Use information that your customers have already provided to your business, such as their email addresses or phone numbers, to match your website's visitors to people who are on Facebook. This can help you attribute more conversions to your ads on Facebook and reach more people through remarketing campaigns. Learn more

⬤ Turn on Automatic Advanced Matching

**Verify the customer information you want to send.**

⬤ City, State, ZIP/Postal Code        ⬤ Country          ⬤ Date of birth

⬤ Email                                ⬤ External id        ⬤ Gender

⬤ First and last name                  ⬤ Phone number

This information will be hashed to better protect user privacy before it is sent to Facebook. Sensitive information, such as financial, health and government ID data will not be sent. Learn more

*Figure 9*[33]

70.    The above identifying categories of data are shared alongside records of subscribers' interactions (i.e., "events") and therefore are linked with the titles of the videos they request or obtain just like the FID. When Advanced Matching is used by a website, such as Defendant's, the Pixel transmission includes the URL with the video title, the subscribers' FID, and the name and email the subscriber used to register with TBN (among other irrelevant datapoints).

71.    Advanced Matching shares this information even if a user is logged out of Facebook, and the Advanced Matching enhancement facilitates Meta's matching of subscriber interactions with their Facebook profiles even when subscribers use

---

[32] *Events Manager Data Sources*, Meta Platforms, Inc. https://www.facebook.com/events_manager2 (last visited March 18, 2025).
[33] Each category of information is automatically toggled on once the website owner activates "Turn on Automatic Advanced Matching."

1  tools to prevent disclosure of information via cookies or similar technologies.[34]

2  Under such circumstances, the Pixel transmission would send the URL with the

3  video title and the name and email the subscriber registered with TBN (again,

4  among other irrelevant datapoints). Specifically, when setting up Advanced

5  Matching, TBN made the affirmative choice to share its subscribers' names and

6  email addresses with Meta.

7      72.    TBN implemented Advanced Matching to transmit subscribers' first

8  (i.e., [fn]) and last (i.e., [ln]) names as well as their email addresses (i.e., [em])[35] as

9  shown below:



**General:**

**Request URL:** https://www.facebook.com/privacy_sandbox/pixel/register/trigger/?id=802720983234561&ev=PageView&dl=https%3A%2F%2Fwww.tbnplus.com%2Fm%2FehRnOR3F%2&will-god-answer-my-prayer-episode-847&3Fr%3DesKIBgtP%26play%3D1&rl=https%3A%2F%2Fwww.huckabee.tv%2F&if=false&ts=1706893005576&sw=1920&sh=1080&udff[fn]=bd77b1b05a24c315dd96e1d5dee59564c5c8bef8d953aefab6765c65ba111787&udff[ln]=e420eb81d1179e1d06fa9d50691b06a53b8ed79035f4d6c1d3028e9fc4e04487&udff[em]=615c45abbd86068d70d92b6cb1ad3657d9deccf7d0622a914692a0ec33d537be&v=2.9.144&r=stable&ec=10&o=6174&fbp=fb.1.1706892732880.1490655435&cs_est=true&ler=other&cdl=API_unavailable&it=1706892881580&coo=false&exp=e1&rqm=FGET

**HTTP Version:** http/2.0

**Request method:** GET

**Remote Address:** 31.13.85.36

*Figure 10*[36]

---

[34] Mattu, Waller, Fondrie-Teitler, and Gorelick, *How We Built a Meta Pixel Inspector*, The Markup (April 28, 2022) https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector

[35] Meta, *Advanced Matching*, Meta Developer Guide, https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching/ (last accessed March 19, 2025)

[36] It should be noted that the hashed values of first name (udff[fn]), last name (udff[ln]), and email (udff[em]) can be seen being sent in Figures 4 and 6 above as well.

73.    Although the names and emails are hashed (i.e., encrypted), they are hashed *pursuant to Meta's own policies*[37] *for doing so*, and "Meta can…use hashed identifiers to better match people visiting your website with people on Facebook."[38]

74.    More importantly, the "hashing" Meta requires is a fundamentally weak encryption system (SHA-256); there are many publicly available websites which can quickly decode such hashed values. Meta can (and does) instantaneously reverse-hash this information, but even non-technical internet users can reverse hash such data through publicly available websites such as md5hashing.net where SHA-256 values can be decoded into their original form. *Figure 11* shows the decoded values of the udff[fn] and udff[ln] values shown in *Figure 10*:



*Figure 11*

75.    Use of Advanced Matching increases TBN's advertising impact by allowing TBN to "increase the number of attributed conversions…that happen on [the TBN] website[,]…increase [its] custom audience size [by] better match[ing] TBN] website visitors to people on Meta[,]…and [d]ecrease the cost per conversion

---

[37]    Meta, *Meta Business Tools Terms*, (April 25, 2023) https://www.facebook.com/legal/technology_terms (last accessed March 10, 2025).
[38]    Lu, Christine, *Advanced matching in Facebook Pixel*, Meta (July 20, 2018) https://developers.facebook.com/ads/blog/post/v2/2018/07/20/advanced-matching-pixel/ (last accessed March 18, 2025).

[by] better identify[ing] and deliver[ing] ads to the types of people likely to take the actions [TBN] care[s] about."[39]

76.  TBN, through its Pixel and the Advanced Matching enhancement, shares the PII of every subscriber who requests or obtains video material from TBN+—regardless of their status as a Facebook user, their logged-in status on Facebook, or their use of browsers or security software which blocks transmissions of information to third parties.

### B. Via The Conversions API

77.  Upon information and belief, Defendant configured a Meta product called Conversions API ("CAPI") to disclose consumers' PII to Meta as well.

78.  CAPI operates directly from TBN's server to transmit PII, unlike the Meta Pixel which operates from within Defendant's website code and forces the subscriber's browser to share information with Meta.

79.  Like the Advanced Matching enhancement for the Pixel, CAPI uses "[TBN's] marketing data…to help optimize ad targeting[.]"[40] TBN's server identifies its subscribers by their names and their email addresses. CAPI sends website events which "are linked to your pixel and behave like events sent through the pixel[.]"[41] Just like the Pixel, CAPI monitors and records subscribers' interactions with the TBN+ webpage and shares such records with Meta. Unlike the Pixel, CAPI shares such information from TBN's server, not by forcing the subscribers' browser to transmit information to Meta.

---

[39] *About Advanced Matching for Web*, Meta Platforms, Inc. https://www.facebook.com/business/help/611774685654668?id=12053766828321 42 (last visited March 18, 2025).

[40] *About Conversions API*, Meta https://www.facebook.com/business/help/2041148702652965?id=8188590323179 65 (last accessed March 19, 2025).

[41] *Id.*

80.    Specifically, CAPI operates by sharing the titles of videos a subscriber requests or obtains alongside personal information stored on TBN's server, which includes name, email address, or any other personal information TBN configures it to transmit.

81.    Indeed, Meta markets CAPI as "designed to create a direct connection between [Web hosts'] marketing data and [Meta]."[42]  CAPI collects PII stored on the website host's server and sends such PII directly from Defendant to Meta.

82.    Critically, Meta allows users to register a Facebook account using an email address. When receiving email addresses of online subscribers via CAPI, Meta can instantaneously identify such subscribers' Facebook profiles, just as if it received the subscribers' FIDs.

83.    Because CAPI is a server side technology, a subscriber's attempts to thwart such privacy violations are rendered ineffective. Meta suggests website owners should use CAPI alongside the Pixel because it allows the host "to share website events [with Meta] that the pixel may lose."[43]

84.    When Defendant shares this PII, it enables Meta to identify subscribers requesting or obtaining prerecorded audio visual materials pertaining to, for example, issues of mental health,[44] faith, or self-esteem – issues inherently personal to individuals seeking guidance from a confidential religious leader, which is what Defendant holds itself out to be. Instead, Defendant then discloses this information to Meta for the purpose of lining its pockets, helping businesses, such as Defendant,

---

[42] *Id*.

[43] *Best Practices – Conversions API*, Meta,
https://developers.facebook.com/docs/marketing-api/conversions-api/best-practices/ (last visited March 19, 2025).

[44] Meta Business Help Center, *About prohibited information*, Meta
https://www.facebook.com/business/help/361948878201809?id=18885272611056
5 (last visited March 12, 2024).

advertise their products and services to the specific individuals seeking this sensitive guidance.

85.    The PII shared by Defendant is personal and unique to Plaintiffs and each Class member. Defendant's choices also affect Plaintiffs and Class Members' control of information concerning their person. "Most Americans hold strong views about the importance of privacy in their everyday lives,"[45] and 93% of adults believe it is important to have control over who can access information about them.[46]

86.    The VPPA establishes a right to privacy in U.S. citizens' PII regardless of the medium through which prerecorded audio visual material is requested or obtained. It imposes responsibilities on video tape service providers, like Defendant, to limit disclosure of PII.

87.    By knowingly disclosing its subscribers' PII to Meta, Defendant violates their privacy rights protected by the Video Privacy Protection Act.

88.    As demonstrated in the above *Figures 4-11*, the Meta technologies Defendant chose to install operated exactly as they were designed – providing Meta with a link to Plaintiffs' and the class members' Facebook profiles identifying the audio visual materials requested or obtained from the Website.

### IV.    Defendant's Disclosure of PII is Knowing Because It Designed Its Platform to Share PII.

89.    Defendant operates its Website in the U.S., accessible from a computer browser at https://www.tbnplus.com/.  When Defendant developed its Website, it

---

[45] Mary Madden & Lee Rainie, *Americans' Attitudes About Privacy, Security and Surveillance*, Pew Res. Ctr. (May 20, 2015) *see also* EPIC, *Public Opinion on Privacy* (2018).

[46] *Id.*

purposefully installed and programmed not one, but two Pixels into its Website operation, thus making the knowing choice to share subscribers' PII with Meta.[47]

90.   At all relevant times, Defendant knew the Pixel, Advanced Matching, and CAPI disclose PII to Meta. This is evidenced by, among other things, (a) the inherent purpose and function of the these technologies, which TBN installed to collect information about how users interact with its website, (b) the vast amount of information on the internet and in the news about Meta's advertising practices, making these practices common knowledge, and (c) the fact that Meta expressly reveals this fact to Defendant both when Defendant obtained the code to install the technologies, and when Defendant agreed to Meta's Business Tools Terms.

91.   Defendant's knowledge of these technologies is further evidenced by the fact that Defendant benefitted from them. Installation of the Pixel, Advanced Matching, and CAPI enabled TBN to target digital advertising to its subscribers (and to potential subscribers) based on the material those subscribers previously requested or obtained from TBN+, including prerecorded audio visual materials.[48]

92.   In addition to receiving the benefits from enhanced targeted advertising, TBN received useful analytics from its Pixels, including about its audience demographics (age, gender, location, interests), helping TBN tailor content and advertising to specific segments.

---

[47] Similar to the FID, which identifies a particular Facebook profile, pixels also possess their own unique numeric identifiers, Facebook Pixel IDs. The Facebook Pixel IDs associated with TBN's Meta Pixels are 802720983234561 (which operates on tbnplus.com and tbn.org) and 536029163624638 (which operates on shop.tbn.org where hard copy DVDs are sold). Each Pixel alone shares, together in one transmission, a subscriber's FID coupled with the title of the prerecorded audio visual material that subscriber requests or obtains.

[48] Meta for Developers, *Conversion Tracking*, Meta (2024) https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking/ (last visited January 30, 2024).

93.  Defendant specifically benefitted from its installation of these technologies because Defendant advertises on Facebook, meaning its disclosure of subscribers' interactions to Meta ensured its ads were shown to the right individuals on Facebook at exactly the right time.

94.  Defendant is the sole operator of TBN+, and Defendant is solely responsible for the decisions it makes about what technology to include within its Website.  Defendant made the affirmative decision to include the Meta Pixel, Advanced Matching, and CAPI on TBN+.

*A.  Meta Thoroughly Explains the Function of its Advertising Technologies on Its Website.*

95.  To install a Meta Pixel, website operators must visit Meta's webpage from within their Meta Ads Manager account and navigate to the "Events Manager" page. From there, website operators can download the Pixel's base code.[49] The "Events Manager" page provides substantial information about the Pixel and how it functions.

96.  From this same page, Meta explains to prospective Pixel users that "[t]he Meta Pixel is a piece of code that you put on your website that allows you to measure the effectiveness of your advertising by understanding the actions people take on your website…. Once you've set up the Meta Pixel, the pixel will log when someone takes an action on your website…. The pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager. From there, you'll be able to see the actions that your customers take. You'll also have options to reach those customers again through future Meta ads."[50]

---

[49]  Meta for Developers, *Get Started*, Meta (2024) https://developers.facebook.com/docs/meta-pixel/get-started (last visited October 15, 2024).

[50]  Meta Business Help Center, *About Meta Pixel*, Meta https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited June 19, 2024).

97.    In its "Get Started" page, Meta explains "[b]y default, the Pixel will track URLs visited, domains visited, and the devices your visitors use."[51] In addition, website operators can also program their Pixel to track "conversions" (website visitor actions) which are sent to the Facebook Ads Manager and the Facebook Events Manager to be used to analyze the effectiveness of ad campaigns and to define custom audiences to adjust and create new campaigns.[52]

98.    Meta's "Get Started" page further explains how it can identify website visitors and match them to their Facebook pages: "[The Meta Pixel] relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can tally their actions in the Facebook Ads Manager so you can use the data to analyze your website's conversion flows and optimize your ad campaigns."

99.    The purpose of the Meta technologies – tracking and sending website visitor activity to Meta to match with the visitor's Facebook account – is thoroughly explained.

B.    *The Way Defendant Coded Its Pixel Demonstrates Defendant Understands How the Pixel Works*

100.  A Pixel does not appear within a website merely by happenstance, to do so required Defendant to follow detailed instructions as depicted below:[53]

---

[51] Meta for Developers, *Get Started*, *supra*.

[52] Meta for Developers, *Conversion Tracking*, Meta (2024) https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited June 19, 2024).

[53] Meta Business Help Center, *Use the Facebook Event Setup Tool for Web*, Meta (2024) https://www.facebook.com/business/help/777099232674791?id=1205376682832142 (last visited Feb. 6, 2024); "Events websites can choose to track include: 'Subscribe', 'Add Payment Info', 'Search' and 'View Content' among others." *See* Meta, *Specifications for Meta Pixel standard events*, Meta Business Help Center (2024)

add to cart, initiate checkout, purchase, search, add to wishlist and lead events.

**How to use the event setup tool**

1. Sign into your **Meta Ads Manager** account.
2. Select **Events Manager** in the main menu.
3. Click the ⚘ **Data sources** icon on the left side of the page.
4. Select the pixel you'd like to use.
5. Click **Settings**.
6. Select **Open event setup tool** under **Event setup**.
7. Enter your URL and click **Open website**. The event setup tool will launch in your website browser.
8. Click **Review** by each suggested event then select **Confirm** or **Dismiss**.
9. To add events that don't show up in your suggested list, navigate your website as usual to find the buttons or webpages you want. Select **Track new button** or **Track a URL** and follow the onscreen instructions.

**Note**: When you set up an event on a button, you're adding the event to all buttons with the same or similar text on your website.

10. Select an event.
11. Set up parameters for your event.

*Suggested for you*
Troubleshoot a rejected ad →
What to do if your cryptocurrency ad or application is rejected →
Attract new customers with message ads →
Get more website visitors →
⊕

*Figure 12*

101. The Pixel, as programmed on Defendant's Website, betrays the possibility that Defendant is ignorant to this technology. Indeed, that TBN's use of the technology was knowing is further evidenced by the fact that Defendant's Pixel shares information beyond the default categories automatically tracked by a Pixel upon installation. Defendant's Pixel is programmed to collect "Button Click" data, which tracks which buttons or links subscribers click and when they do so. On Defendant's Website, "Button Click" data is disclosed to Meta when a subscriber clicks the button to play or pause prerecorded audio visual material which the subscriber has requested or obtained.

102.  There is no reason a business *must* install the Pixel on its website—a Pixel does not facilitate any necessary website operations whatsoever. But embedding the Pixel within a website's code enables a business, like Defendant, to benefit from the collection of measurable data that details how users interact with

---

https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited February 6, 2024).

their websites, such as whether users initiate purchases on the website, what items they view, and, relevant here, the prerecorded audio visual material users request or obtain on a particular webpage.[54]

103.  Moreover, it should be noted that TBN's implementation of Advanced Matching and CAPI required it to affirmatively request and activate such technologies from within the Meta Business Tools configuration process. Both Advanced Matching and CAPI are addressed in their own separate sections and required TBN to take the step of toggling such technology on from within such configuration process. TBN was required to activate each of the Meta Business Tools separately to successfully implement them.

## PLAINTIFF-SPECIFIC ALLEGATIONS

*Plaintiff Kelly Allen*

104.  Plaintiff Kelly Allen is a subscriber of Defendant's and has been since 2020.

105.  When she registered her subscription, she provided TBN with her full name and her email address, and she selected a password. TBN recorded such information within its records and registered it to her TBN+ subscription. Plaintiff Allen's email address and password operated as her login credentials. Through such login credentials, TBN+ recognized her subscription and permitted her access to its restricted audio visual materials.

---

[54] "The Meta Pixel can collect the following data: Http Headers – Anything that is generally present in HTTP headers, a standard web protocol sent between any browser request and any server on the internet. This information may include data like IP addresses, information about the web browser, page location, document, referrer and person using the website. Pixel-specific Data – Includes Pixel ID and the Facebook Cookie. Button Click Data – Includes any buttons clicked by site visitors, the labels of those buttons and any pages visited as a result of the button clicks." Meta for Developers, *Meta Pixel*, Meta (2024) https://developers.facebook.com/docs/meta-pixel/ (last visited June 7, 2024).

106. Every time Plaintiff Allen visited TBN+ to watch videos, she entered her login credentials and TBN+ granted her access to its video-streaming platform so long as the credentials she entered matched the credentials it stored within its records. Plaintiff Allen did not update or change her email address after originally establishing her subscription account: TBN+ registered her subscription with that address and permitted her access to the website with the same email address for the entirety of their relationship. TBN+ still possess Plaintiff Allen's email address within its records as one of its subscribers.

107. By registering her subscription, Allen obtained access to Defendant's restricted audio visual materials, and Defendant delivered its audio visual materials to her through its video-streaming platform.

108. Plaintiff Allen continued to maintain her subscription for multiple years.

109. When Plaintiff Allen registered her subscription, she agreed to TBN's Terms of Use, which have governed the relationship between her and TBN since that time. TBN interprets its Terms of Use as governing such relationship and as establishing that Plaintiff Allen consented to its disclosure of her video-watching behavior to third parties (she did not), which demonstrates TBN believes a sufficient relationship exists between itself and Plaintiff Allen for such terms to apply.[55] (Plaintiff Allen did not consent to such sharing of her video-watching behavior and TBN's Website, Privacy Policy, and Terms of Use at the time she registered her account and viewed videos cannot by any measure satisfy the VPPA's consent requirement.)[56]

---

[55] *See* TBN's Answer to Plaintiff Leah Smith's Second Amended Complaint, Thirteenth Affirmative Defense, CaseNo.: 8-24-cv-01046-JVS-ADS, Oct. 31, 2024.

[56] Without actually changing its Privacy Policy or Terms of Use, at some point in late 2024 TBN updated the Cookie Banner present on its Website in an attempt to notify its users that their video-watching information would be disclosed to third

110. TBN sent Plaintiff Allen multiple communications at the contact information she provided when establishing her subscription, including emails advertising TBN+ video content.

111. Plaintiff Allen has also been a Facebook user during the class period. When she created her Facebook profile, Plaintiff Allen provided Meta with the required information to create her profile: her name, date of birth, gender, contact information, and password.

112. During the relevant period, Plaintiff Allen's Facebook profile included publicly-available information specifically and uniquely identifying her, including but not limited to her full name (first, middle and last), her photograph, and her city and state of residence. Plaintiff Allen's Facebook profile was accessible to any person in possession of Plaintiff Allen's unique FID. Any person could use her FID to link directly to her Facebook page and see this publicly-available information that *specifically* and *uniquely* identifies her among the 8 billion people in the world.

113. Plaintiff Allen requested or obtained prerecorded audio visual material solely available through her subscription from https://www.tbnplus.com/. Plaintiff Allen requested audio visual materials from TBN+ using her web browser in the following manner: When Plaintiff Allen selected a specific video to view, her browser sent a GET request to TBN+'s server to view or obtain such audio visual materials. In response, TBN+'s server (after having verified Plaintiff Allen was a credentialed subscriber to its video-streaming platform) delivered such requested video materials to Plaintiff Allen's browser, which then played the material at Plaintiff Allen's direction.

114. Plaintiff Allen created her account on tbnplus.com to request or obtain prerecorded episodes of, among other prerecorded content, "K-LOVE Fan Awards" and "Takeaways" outside of its normal broadcast times. "K-Love Fan Awards" is a

---

parties. Even so, the updated Cookie Banner cannot serve to retroactively establish consent, nor does it satisfy the VPPA's consent requirements in any event.

Christian music awards show with multiple episodes.[57] "Takeaways" is Kirk Cameron's 96-episode series with "well-informed guests… discuss[ing] pressing issues facing Christians today, and find[ing] actionable takeaways you can use today to bring more of Heaven to Earth."[58]

115. In the two years preceding this action, Plaintiff Allen requested or obtained prerecorded audio visual material on the Website from her computer Browser. Specifically, Plaintiff Allen requested or obtained prerecorded, previously aired episodes of "K-Love Fan Awards" and "Takeaways." Plaintiff Allen also requested or obtained prerecorded audio visual material through the TBN+ application available on other devices.

116. Plaintiff Allen had a Facebook profile during the time she was a subscriber of Defendant's. Defendant knowingly disclosed to Meta her FID coupled with the title of the prerecorded audio visual material she requested or obtained and the URLs to access those videos.

117. Just as depicted in the Kendra Marta exemplars in *Figures 4-11* above, Defendant disclosed to Meta the titles of the prerecorded audio visual materials Plaintiff Allen requested or obtained along with the c_user cookie containing her FID, which is directly linked to Plaintiff Allen's personal Facebook profile, in the same network transmission.

118. In addition to the disclosure of her FID to Meta, TBN also disclosed her name and email address to Meta alongside the videos she requested or obtained through its use of Advanced Matching.

---

[57] TBN+, *K-Love Fan Awards*, https://www.tbnplus.com/c/sns/KiZD5RBU (last visited March 7, 2025).

[58] TBN+, *Takeaways*, https://www.tbnplus.com/c/sy/tsVhjX4b (last visited March 7, 2025).

119. Continuing, through its use of CAPI, TBN sent Meta Plaintiff Allen's name, email address, and other personal information to Meta directly from its server alongside the titles of the video materials she requested or obtained.

120. Records for Plaintiff Allen's use of TBN+ are possessed by Meta and reflect that the records were received via TBN+'s pixel with Pixel ID 802720983234561 and its pixel with Pixel ID 536029163624638.

121. Each time Defendant knowingly disclosed Plaintiff Allen's PII to Meta, it violated her rights under the VPPA.

*Plaintiff Christopher Thompson*

122. Plaintiff Christopher Thompson is a subscriber of Defendant's and has been since 2023.

123. When he registered his subscription, he provided TBN with his full name and his email address, and he selected a password. TBN recorded such information within its records and registered it to his TBN+ subscription. Plaintiff Thompson's email address and password operated as his login credentials. Through such login credentials, TBN+ recognized his subscription and permitted him access to its restricted audio visual materials.

124. Every time Plaintiff Thompson visited TBN+ to watch videos, he entered his login credentials and TBN+ granted him access to its video-streaming platform so long as the credentials he entered matched the credentials it stored within its records. Plaintiff Thompson did not update or change his email address after originally establishing his subscription account: TBN+ registered his subscription with that address and permitted his access to the website with the same email address for the entirety of their relationship. TBN+ still possess Plaintiff Thompson's email address within its records as one of its subscribers.

125. By registering his subscription, Plaintiff Thompson obtained access to Defendant's restricted audio visual materials, and Defendant delivered its audio visual materials to him through its video-streaming platform.

126. Plaintiff Thompson continued to maintain his subscription for over a year.

127. When Plaintiff Thompson registered his subscription, he agreed to TBN's Terms of Use, which have governed the relationship between him and TBN since that time. TBN interprets its Terms of Use as governing such relationship and as establishing that Plaintiff Thompson consented to its disclosure of his video-watching behavior to third parties (he did not), which demonstrates TBN believes a sufficient relationship exists between itself and Plaintiff Thompson for such terms to apply. (Plaintiff Thompson did not consent to such sharing of his video-watching behavior and TBN's Website, Privacy Policy, and Terms of Use at the time he registered his account and viewed videos cannot by any measure satisfy the VPPA's consent requirement.)

128. TBN sent Plaintiff Thompson multiple communications at the contact information he provided when establishing his subscription, including emails advertising TBN+ video content.

129. Plaintiff Thompson has also been a Facebook user during the class period. When he created his Facebook profile, Plaintiff Thompson provided Meta with the required information to create his profile: his name, date of birth, gender, contact information, and password.

130. During the relevant period, Plaintiff Thompson's Facebook profile included publicly-available information specifically and uniquely identifying him, including but not limited to his full name (first, middle and last), his photograph, and his city and state of residence. Plaintiff Thompson's Facebook profile was accessible to any person in possession of Plaintiff Thompson's unique FID. Any person could use his FID to link directly to his Facebook page and see this publicly-available information that *specifically* and *uniquely* identifies him among the 8 billion people in the world.

131. Plaintiff Thompson requested or obtained prerecorded audio visual material solely available through his subscription from https://www.tbnplus.com/. Plaintiff Thompson requested audio visual materials from TBN+ using his web browser in the following manner: When Plaintiff Thompson selected a specific video to view, his browser sent a GET request to TBN+'s server to view or obtain such audio visual materials. In response, TBN+'s server (after having verified Plaintiff Thompson was a credentialed subscriber to its video-streaming platform) delivered such requested video materials to Plaintiff Thompson's browser, which then played the material at Plaintiff Thompson's direction.

132. Plaintiff Thompson created his account on tbnplus.com to request or obtain prerecorded episodes of, among other prerecorded content, "Praise," outside of its normal broadcast times. "Praise", with 637 episodes, is "TBN's Flagship program feature[ing] in depth interviews with leading pastors, authors, musicians, athletes, and politicians."[59]

133. In the two years preceding this action, Plaintiff Thompson requested or obtained prerecorded audio visual material on the Website from his computer Browser. Specifically, Plaintiff Thompson requested or obtained prerecorded, previously aired episodes of "Praise." Plaintiff Thompson also requested or obtained prerecorded audio visual material through the TBN+ application available on other devices.

134. Plaintiff Thompson had a Facebook profile during the time he was a subscriber of Defendant's. Defendant knowingly disclosed to Meta his FID coupled with the title of the prerecorded audio visual material he requested or obtained and the URLs to access those videos.

135. Just as depicted in the Kendra Marta exemplars in *Figures 4-11* above, Defendant disclosed to Meta the titles of the prerecorded audio visual materials

---

[59] TBN+, *Praise*, https://www.tbnplus.com/c/sy/sMW1pnGB (last visited March 7, 2025).

Plaintiff Thompson requested or obtained along with the c_user cookie containing

his FID, which is directly linked to Plaintiff Thompson's personal Facebook profile,

in the same network transmission.

136.  In addition to the disclosure of his FID to Meta, TBN also disclosed

Plaintiff Thompson's name and email address to Meta alongside the videos he

requested or obtained.

137. Continuing, through its use of CAPI, TBN sent Meta Plaintiff

Thompson's name, email address, and other personal information to Meta directly

from its server alongside the titles of the video materials he requested or obtained.

138.  Records for Plaintiff Thompson's use of TBN+ are possessed by Meta

and reflect that the records were received via TBN+'s pixel with Pixel ID

802720983234561 and its pixel with Pixel ID 536029163624638.

139.  Each time Defendant knowingly disclosed Plaintiff Thompson's PII to

Meta, it violated his rights under the VPPA.

## CLASS ALLEGATIONS

140.  Plaintiffs bring this lawsuit under the Rules 23(a) and (b) of the Federal

Rules of Civil Procedure on behalf of the following Class:

> All persons in the United States who, between March 18,
> 2022 and the date of preliminary approval, (i) have login
> credentials to access TBN+, (ii) requested or obtained
> TBN+ audio visual materials, and who (iii) TBN+
> identified to a third party as having requested or obtained
> audio visual materials from TBN+.

141. Excluded from the Class is Defendant, any controlled person of

Defendant, as well as the officers and directors of Defendant and the immediate

family members of any such person. Also excluded is any judge who may preside

over this cause of action and the immediate family members of any such person.

Plaintiffs reserve the right to modify, change, or expand the Class definition based upon discovery and further investigation.

142. **Numerosity**: The Class consists of at least hundreds of individuals, making joinder impractical.

143. **Commonality and Predominance**: Common questions of law and fact exist with regard to the claim and predominate over questions affecting only individual Class members. Questions common to the Class include:

A.    Whether Defendant knowingly disclosed Plaintiffs' and Class members' PII to Meta;

B.    Whether Defendant's conduct violates the Video Privacy Protection Act, 18 U.S.C. § 2710; and

C.    Whether Defendant should be enjoined from disclosing Plaintiffs' and Class members' PII.

144. **Typicality**: Plaintiffs' claims are typical of the claims of the members of the proposed Class because, among other things, Plaintiffs and members of the class sustained similar injuries from Defendant's uniform wrongful conduct, and their legal claims arise from the same events of wrongful conduct by Defendant.

145. **Adequacy of Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class, and Plaintiffs have no interests antagonistic to those of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions, including privacy-protection cases.

146. **Predominance and Superiority**: Plaintiffs satisfy the requirements of Rule 23(a) as well as the requirements for maintaining a class under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual Class members, and a class action is superior to individual litigation and all other available methods for the fair and efficient adjudication of this controversy. The amount of damages available to individual plaintiffs is insufficient to make

litigation addressing Defendant's conduct economically feasible in the absence of the class action procedure. Individualized litigation also presents the potential for inconsistent or contradictory judgments, and increases the delay and expense presented by the complex legal and factual issues of the case to all parties and the court system. By contrast, the class action presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

147. **Injunctive Relief**: Plaintiffs also satisfy the requirements for maintaining a class under Rule 23(b)(2). Defendant acted on grounds that apply generally to the proposed Class, making final declaratory or injunctive relief appropriate with respect to the proposed Class as a whole.

148. **Particular Issues.** Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(c)(4). Their claims consist of particular issues that are common to all Class members and are capable of class-wide resolution that will significantly advance the litigation.

## CAUSE OF ACTION
### Violation of the Video Privacy Protection Act
### 18 U.S.C. § 2710

149. Plaintiffs incorporate and reallege the above factual allegations by reference.

150. The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifiable information" concerning any "consumer" to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

151. As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials[.]" Defendant is a "video tape service provider" as defined

in 18 U.S.C. § 2710(a)(4) because it is engaged in the business of delivering prerecorded audio visual materials and those sales affect interstate or foreign commerce.

152. As defined in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser, or subscriber of goods or services from a video tape service provider." As alleged above, Plaintiffs and Class members are subscribers to Defendant's service who requested or obtained prerecorded audio visual material only available upon subscribing. Plaintiffs and Class members (i) provided personal information to TBN to register their subscriptions, (ii) permitted TBN to store their personal information as login credentials, (iii) obtained access to restricted, exclusive video materials unavailable to non-subscribers, (iv) requested TBN to deliver audio visual materials to their web browsers, which TBN did, and (v) entered into a relationship with TBN for the specific purpose of accessing restricted video materials. Thus, Plaintiffs and Class members are "consumers" under this definition.

153. As defined in 18 U.S.C. § 2710(a)(3), "'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

154. Defendant knowingly disclosed Plaintiffs' and Class members' PII—specifically, their FIDs and the title and URL of the prerecorded audio visual material they requested or obtained—to Meta through its use of the Meta Pixel.

155. Defendant also knowingly disclosed Plaintiffs' and Class members' PII by sharing their names and email addresses with Meta alongside the prerecorded audio visual material they requested or obtained from the TBN+ video-streaming platform through its use of Advanced Matching and CAPI.

156. This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified Plaintiffs and each Class member to Meta as having requested or obtained Defendant's prerecorded audio visual material, including the specific prerecorded audio visual materials requested or

obtained on Defendant's Website. Indeed, Meta (or anyone possessing a class member's FID) can identify the individual associated with an FID simply by entering "Facebook.com/[FID]" into a web browser.

157. Defendant never obtained from Plaintiff, or any Class member, informed, written consent. More specifically, Defendant never obtained from Plaintiffs or any Class member, informed, written consent in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; Defendant never obtained from Plaintiffs or any Class member, informed, written consent that, at the election of the consumer, was given at the time the disclosure is sought or was given in advance for a set period of time, not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner; and Defendant never provided an opportunity, in a clear and conspicuous manner, for Plaintiffs or any Class member to withdraw consent on a case-by-case basis or to withdraw consent from ongoing disclosures, at the consumer's election. *See* 18 U.S.C. § 2710(b)(2).

158. Defendant's disclosures were made knowingly, as it programmed the Pixel (and the Advanced Matching enhancement) into its Website code and the Conversions API within its server, knowing that doing so would disclose to Meta the titles of the prerecorded audio visual materials and the FIDs, names, and emails pertaining to any subscriber who requested or obtained a prerecorded audio visual material.

159. By disclosing Plaintiffs' and the Class members' PII, Defendant violated Plaintiffs' and Class members' statutorily protected right to request or obtain prerecorded audio visual materials in private. 18 U.S.C. § 2710(c).

160. Plaintiffs and Class members have suffered loss by reason of Defendant's violations, including, but not limited to, violations of their right of privacy, loss of value in their personally identifiable information, and the inequity

of Defendant's enrichment by means identifying information pertaining to Plaintiffs and Class members without authorization or consent.

161.  As a result of these violations, Defendant is liable to Plaintiffs and Class members.

162.  On behalf of herself and all members of the Class, Plaintiffs seek to enjoin Defendant's disclosures of PII; liquidated damages in the amount of $2,500 per violation; reasonable attorneys' fees and costs; and all other preliminary or equitable relief the Court deems appropriate. 18 U.S.C. § 2710(c)(2)(A).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court:

i.      Certify this case as a class action, and appoint Plaintiffs as Class Representatives and the undersigned attorneys as Class Counsel;

ii.     Find that Defendant's actions, as described herein, constitute violations of the VPPA;

ii.     Enter judgment in favor of Plaintiffs and the Class;

iii.    Enter an order permanently enjoining Defendant from disclosing PII to third parties in violation of the VPPA;

iv.     Award Plaintiffs and Class members the actual and/or statutory damages to which they are entitled under the VPPA;

v.      Award Plaintiffs and Class members pre- and post-judgment interest as provided by law;

vi.     Award all costs, including experts' fees, attorneys' fees, and the costs of prosecuting this action; and

vii.    Award such other legal and equitable relief as the Court deems necessary and appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of all issues triable as of right.

Dated: March 20, 2025

Respectfully submitted,

**WADE KILPELA SLADE LLP**
Gillian L. Wade, State Bar No. 229124
gwade@waykayslay.com
Marc A. Castaneda, State Bar No. 299001
marc@waykayslay.com
2450 Colorado Ave., Ste. 100E
Santa Monica, California 90404
Telephone: (310) 396-9600

Allen Carney (to apply for *pro hac vice*)
acarney@cbplaw.com
Joseph Henry (Hank) Bates, III (SBN 167688)
hbates@cbplaw.com
Samuel Randolph Jackson
sjackson@cbplaw.com (to apply for *pro hac vice*)
**CARNEY BATES & PULLIAM, PLLC**
One Allied Drive, Suite 1400
Little Rock, AR 72202
Telephone: (501) 312-8500
Facsimile: (501) 312-8505